**The PEOPLE of the State of Colorado,**
**Plaintiff-Appellee,**

v.

**Steven Richard MARQUIZ,**
**Defendant-Appellant.**

**No. 82CA1246.**

Colorado Court of Appeals,
Div. I.

March 29, 1984.

Rehearing Denied May 3, 1984.

Forman, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Lawrence P. Griffin, Clifford J. Barnard, Boulder, for defendant-appellant.

BERMAN, Judge.

Defendant, Steven Richard Marquiz, appeals from a jury verdict based on findings that he was sane, and was guilty of first degree murder and conspiracy to commit first degree murder. We affirm.

In January 1981, defendant discovered that some money, cocaine, and liquor were missing from his apartment. He decided that 17-year-old Debbie Terhorst must have been the thief because she had been staying at the apartment with Randy Gallegos, who was defendant's friend as well as Debbie's boyfriend.

On January 9, 1981, defendant told several of his friends that, because Debbie had "ripped him off," he wanted her "canned" and "put in a pine box." Defendant discussed it with Gallegos and they decided to kill Debbie whether she had taken the things or not.

Defendant then sought advice from his girlfriend's half-brother, Lloyd Chaffins, as to the "best" method to accomplish a murder. Chaffins, seemingly unaware of who defendant's victim was to be, told defendant that if he were to kill someone, he would take the victim "up on Lookout Mountain," "stab them" or "cut their throat," and "dispose of the knife."

On the evening of January 10, 1981, defendant, after telling his girlfriend, Angela, that he was going to look for Debbie and kill her, left the bar where he and Angela worked. He was accompanied by Gallegos and a third man, Antonio Laroza. Thereafter, Debbie phoned Angela at the lounge, but during their conversation Angela made no attempt to warn Debbie that she was about to be murdered.

Through directions provided by Chaffins, the defendant, Gallegos, and Laroza found Debbie at a friend's apartment and told her to collect her belongings to go to a place in the mountains where they would all stay.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H.

The three men then drove Debbie to Lookout Mountain where she was stabbed to death.

Later on the evening of the murder and again the following morning, defendant told several friends, including Angela, that Debbie had been "taken care of and that she's been stabbed several times and her throat was slashed ... [and that] she looked like a piece of meat,"—to which Angela responded, "Well, I'm going to keep her shoes, take her shoes." The following day, the defendant and his two confederates were arrested.

Several hours after the arrest, defendant made a recorded statement to the sheriff's department. Before being questioned, defendant read, initialed, and orally affirmed his understanding of each of his *Miranda* rights and signed a written waiver of each of those rights. He further orally affirmed that he was under the influence of neither alcohol nor drugs and that he "freely" and "voluntarily" wished to talk to the sheriff's investigator.

On February 10, 1981, a competency examination of the defendant was ordered. One week later, the defendant filed a motion for appointment of a private investigator, but the court deferred ruling on this motion until after the preliminary hearing.

On April 20, 1981, defendant was determined to be incompetent to stand trial and was sent to the Colorado State Hospital. However, on December 17, 1981, a competency hearing was held and the trial court found that the defendant was restored to competency. Meanwhile, on November 18, 1981, the trial court granted the defense motion for appointment of a private investigator to aid in the defendant's defense.

In April 1982, following defendant's plea of not guilty by reason of insanity, the trial court denied defendant's request for a continuance of the sanity trial. A sanity trial was conducted on April 13, 1982, and the defendant was found to have been sane on the date of the murder. A jury trial on the merits followed in May 1982, and defendant was convicted and sentenced to life imprisonment for first degree murder and to a concurrent 12-year term for conspiracy to commit first degree murder.

I.

■ Defendant's first contention is that the trial court violated his constitutional rights to equal protection and effective assistance of counsel, and his statutory right under § 18–1–403, C.R.S. (1978 Repl.Vol. 8), by delaying the appointment of an investigator to aid defendant's attorney until November 18, 1981. We disagree.

The granting or denial of a motion to provide supporting services to counsel for an indigent defendant in a criminal prosecution is a matter within the sound discretion of the trial court. *Brown v. District Court*, 189 Colo. 469, 541 P.2d 1248 (1975).

■ There was no abuse of that discretion here. Since the request for an investigator was made after the defendant's lack of competency was raised, and since it was not clear, therefore, that defendant would ever be tried, it was only reasonable for the trial court to defer its ruling on the motion until after it had received the October 22, 1981, letter from the State Hospital stating that defendant had been restored to competency and until the court held a hearing on November 18, 1982, reaching a preliminary determination that defendant had in fact been so restored.

Furthermore, no prejudice to defendant arose as a result of the delayed appointment of an investigator since: (1) the record reveals that defense counsel did in fact investigate the case and interview witnesses *before* the private investigator was appointed, and (2) the record shows that, even as late as January 7, 1982, seven weeks *after* the court appointed the investigator, defense counsel stated at a hearing that he had not even contacted the investigator.

II.

■ On February 4, 1982, some 13 months after a blood sample was taken by the People for blood-typing purposes only,

defendant asked that he be furnished with that sample of his blood. The prosecution's failure to do so is asserted as error because defendant alleges that such a sample might have shown that he was under the influence of narcotics when he made the recorded statements of January 12, 1981. We find no error here.

In order to show a violation of defendant's due process rights by the destruction of evidence, the defendant must show: (1) that the evidence was suppressed or destroyed by the prosecution; (2) that the evidence is exculpatory; and (3) that the evidence is material to the defendant's case. *People v. Clements*, 661 P.2d 267 (Colo.1983). The defendant fails the above test on all three counts.

■ First, defendant shows no destruction or suppression by the prosecution of any *evidence*. The blood sample drawn was used only to determine defendant's blood type. Since blood type does not change, the defendant was free independently to test his own blood type.

Our Supreme Court has specifically declined to impose a duty on the investigators of a crime to gather possible exculpatory evidence, or having gathered it, a duty to preserve it for possible use by a defendant. *People v. Roark*, 643 P.2d 756 (Colo.1982). This especially holds true when, as here, the defendant does not make any request until some 13 months after any evidence gathering was completed.

■ Second, defendant made no attempt to show how such evidence, even if it revealed traces of self-induced cocaine in defendant's blood stream, could possibly be exculpatory. There is no evidence whatsoever indicating that a test existed which could have shown on February 4, 1982, the presence of cocaine in a blood sample drawn 13 months earlier. *See People v. Madsen* (Colo.App. No. 82CA0922, March 15, 1984).

■ Third, defendant made no showing of the blood sample's materiality. Even were we to hold that testing would have proven that defendant was under the influ-

ence of drugs and that his statements were, thus, involuntary, the "appropriate remedy" would have been suppression of defendant's January 12, 1981, statements. *See People v. Clements, supra.* But, since defendant admitted substantially nothing in those statements and since overwhelming evidence in the record apart from those statements supports defendant's conviction, the element of materiality is not satisfied. Therefore, defendant's rights to due process were not violated.

### III.

■ The defendant's third contention is that the trial court erred when it denied his motion for continuance of the sanity trial, thereby denying him due process of law. Once again, we disagree.

The denial of a motion for continuance in a criminal proceeding is within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion. *People v. Mann*, 646 P.2d 352 (Colo.1982). The court here did not abuse its discretion; its ruling was correct.

On March 5, 1982, just ten days before the scheduled sanity trial, defendant's parents hired one Dr. Plazak to evaluate the defendant's sanity. The defendant was then granted a continuance until April 13, 1982, in order for Dr. Plazak to examine him. When a further continuance was sought, it was denied.

The trial court was correct in ruling that there was no need for further continuance given the fact that Dr. Plazak actually spent more time with the defendant than did Dr. Miller, the People's psychiatric expert.

### IV.

■ Defendant next argues that the trial court erred in allowing only ten peremptory challenges plus two extra challenges for alternate jurors at both his sanity hearing in April 1982 and his trial of guilt in May 1982. We disagree.

The number of peremptory challenges allowed is governed by the statute and rule

in effect at the time voir dire is conducted, rather than by the law existing at the time of the commission of the offense. *People v. Priest*, 672 P.2d 539 (Colo.App.1983).

■ Voir dire in both of defendant's trials was conducted in 1982. Therefore, § 16–10–104, C.R.S. (1982 Cum.Supp.) (effective July 1, 1981) and Crim.P. 24(d) (effective July 16, 1981) which specify ten peremptory challenges in capital cases are dispositive, and the court properly refused to grant 15 peremptory challenges. *People v. Priest, supra.*

### V.

■ A forensic pathologist testified that the victim had been stabbed once in the left side of the neck, three times in a "deeply penetrating" fashion in the left breast, and once in the middle of her back. In addition, he testified that Debbie's throat had been slashed with such force that the murder would have had to use a "sawing-type" motion to penetrate that deeply, from the neck clear through the victim's fourth and fifth vertebrae.

Defendant's fifth argument is that the trial court erred in admitting an exhibit at the sanity trial consisting of a photograph, taken prior to the autopsy, of the unclothed body of the murder victim, displaying four of the five stab wounds described by the pathologist, as well as the slashed neck of the victim. Defendant argues that, in the context of the sanity hearing, such a photo is irrelevant, highly prejudicial, and likely to mislead the jury. We disagree.

Where, as here, some evidence of defendant's insanity was produced, the burden of proof rests on the People to prove defendant's sanity beyond a reasonable doubt. *People v. Wright*, 648 P.2d 665 (Colo.1982). In determining whether this defendant is sane:

"[C]are should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or a passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes, the person is accounta-

ble to the law." Section 16–8–101, C.R.S. (1978 Repl.Vol. 8). *Cf.* § 16–8–101, C.R.S. (1983 Cum.Supp.) (applicable to offenses committed on or after July 1, 1983).

■ Given the People's burden to prove beyond a reasonable doubt that the defendant, instead of being insane, was acting out of "mental depravity" or "passion" growing out of revenge in murdering Debbie, it was not error for the trial court to admit the exhibit. For, in revealing the number and severity of knife wounds, the photo could serve to prove the "depravity" and revengeful "passion" of the perpetrator of that crime. Hence, it was relevant to a determination of the sanity question.

Further, the photo is a necessary link in a chain of evidence showing that the defendant knew that murder was wrong and that, therefore, he not only planned, but also carried out, the murder by using the exact technique which Chaffins prescribed as having the greatest potential of success in terms of concealment from the authorities. Therefore, the admission of the photo at the sanity trial was proper.

### VI.

■ Defendant's next argument is that certain statements made to a sheriff's investigator on January 12, 1981, should have been suppressed because they were made involuntarily, while defendant was insane and intoxicated. We disagree.

The People must establish, by a preponderance of the evidence, that a defendant's statements are voluntary before such statements are admissible. *People v. Raffaelli*, 647 P.2d 230 (Colo.1982). At the suppression hearing on May 17, 1982, the prosecutor presented expert psychiatric evidence that, at the time of his statements, the defendant was "fully oriented and alert; responsive; polite; shows good memory, recent and remote; seems to relate consequences quite accurately and in order; ... coherent ... and shows no evidence of any disrupted cognitive function."

■ Furthermore, before defendant was questioned, he orally and in writing

affirmed his understanding of each of his *Miranda* rights; signed a written waiver of those rights; and orally affirmed that he was under the influence of neither alcohol nor drugs and that he was speaking to the sheriff's investigator both "freely" and "voluntarily."

"A trial court's finding of fact on the voluntariness of a confession will be upheld by this court on review where, as here, it is supported by adequate evidence in the record." *People v. Raffaelli, supra.*

### VII.

Defendant's next contention is that the trial court committed reversible error in admitting into evidence at the trial on the merits a number of photographs of the victim. Defendant argues that these exhibits are cumulative and that their prejudicial impact outweighs their probative value. The trial court found otherwise and we agree.

The admissibility of photographs into evidence in a homicide prosecution is a matter within the discretion of the trial court. *People v. White,* 199 Colo. 82, 606 P.2d 847 (1980). The trial court's determination in this regard will not be disturbed on review absent an abuse of discretion. *People v. Steele,* 193 Colo. 87, 563 P.2d 6 (1977).

The test for admissibility of photographs in a homicide prosecution rests on whether the probative value of the photographs is "far outweighed" by their potential inflammatory effect on the jury. *People v. White, supra.* Photographs of a murder victim have probative value when they are offered to show the appearance of the victim at the crime scene or to show the location and nature of the victim's wounds. *People v. White, supra.*

Here, under the definition of probativeness set forth in *White,* the evidentiary value of the photographs is readily apparent. Two of the photos show the appearance of the victim at the scene of the crime. In addition, one of these shows the breadth of the neck slash wound, while the other shows its depth. In a third photo, the blood has been washed off of the neck region, thus displaying the location and

nature of the neck slash and stab wounds in a way not visible in the first two. The fourth photo shows the three stab wounds to the chest; the fifth shows the stab wound to the back; and the sixth displays the "defensive" wounds to the victim's hand. These photographs are not inadmissible merely because the condition of the victim was established through the testimony of prosecution witnesses. *People v. White, supra; People v. Harris,* 633 P.2d 1095 (Colo.App.1981).

Defendant especially objects to the admission of one photograph in which the victim's pubic area is exposed, arguing that that photograph may have suggested to the jury that the victim had been sexually molested. However, following the admission of the photograph, the jury was immediately made aware, through defense counsel's cross-examination of the pathologist, that no signs whatsoever of sexual molestation had been discovered. Hence, there was no prejudice to defendant.

*Archina v. People,* 135 Colo. 8, 307 P.2d 1083 (1957), cited by defendant, is inapposite. *Archina,* a case in which the identity of the murderer was primarily at issue, held that it was reversible error to admit morgue photographs of the victim's naked body taken 17 days after the shooting and showing the results of extensive surgery performed after the shooting. Here, in contrast to *Archina,* elements of intent and premeditation, rather than identity, were at issue. Furthermore, here, the photographs were taken within 24 hours of the murder and showed the results of no extensive surgery or wounds other than those inflicted during the murder. Therefore, the trial court did not err in admitting the photographs at trial.

### VIII.

The defendant's next argument is that the evidence was not sufficient to sustain the convictions. With the appropriate test in mind, *see People v. Brassfield,* 652 P.2d 588 (Colo.1982); *People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973), we have reviewed the record and conclude that the evidence was more than sufficient to support the conviction of first degree murder

and conspiracy to commit first degree murder.

## IX.

Defendant's final contention of error is that his conspiracy conviction cannot stand in that he was found guilty of conspiracy to comit first degree murder, despite the acquittal in separate trials of two alleged co-conspirators, Antonio Laroza and Randy Gallegos. We hold that defendant's conspiracy conviction did not violate the rule of consistency (sometimes referred to as the "plurality requirement"). Therefore, we affirm defendant's conspiracy conviction.

In order to be convicted of conspiracy, the rule of consistency requires that a defendant must be shown to have conspired with at least one other person to do an unlawful act; one person cannot conspire with himself. *Archuleta v. People*, 149 Colo. 206, 368 P.2d 422 (1962). Here, there was evidence that Laroza and Gallegos, having the intent to promote or facilitate Debbie's murder, agreed with the defendant to aid in the planning or commission of her murder. However, Laroza and Gallegos were acquitted of conspiracy in trials separate from defendant's.

Nevertheless, "[i]t is well settled ... that in situations in which only one conspirator is brought to trial *or the conspirators are tried separately*, the conviction of the other conspirator may stand." *United States v. Sangmeister*, 685 F.2d 1124 (9th Cir.1982) (emphasis added); *cf. United States v. Shipp*, 359 F.2d 185 (6th Cir.1966), *cert. denied*, 385 U.S. 903, 87 S.Ct. 213, 17 L.Ed.2d 134 (1966) (conspiracy conviction stands after severance of charges against co-conspirator yet to be tried). *Contra Sherman v. State*, 113 Neb. 173, 202 N.W. 413 (1925) (error to sentence convicted conspirator where co-conspirator was separately tried and acquitted).

Here, defendant's conviction is not inconsistent with the acquittals of the other alleged conspirators for Laroza's and Gallegos' "not guilty verdict[s] [are] not necessarily declaration[s] of innocence by the jur[ies], but simply indication[s] of lack of proof of guilt beyond a reasonable doubt." *United States v. Fox*, 130 F.2d 56 (3rd Cir.1942). That is, "acquittal does not have the effect of conclusively establishing the untruth of all the evidence introduced against the defendant." *U.S. v. Sweig*, 454 F.2d 181 (2d Cir.1972). *See also U.S. v. One Assortment of 89 Firearms*, —— U.S. ——, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).

Inasmuch as defendant was tried by a different jury than Laroza or Gallegos, there is no inconsistency in the jury having found defendant guilty of conspiracy, notwithstanding the not guilty verdicts returned by the other juries. Accordingly, we affirm defendant's conviction for conspiracy to commit murder. *See U.S. v. Sangmeister, supra.*

Defendant's remaining contention of error is without merit.

Judgment affirmed.

PIERCE and METZGER, JJ., concur.